Original Proceeding — Certification of Judicial Manpower.
SHAW, Chief Judge.
Under the provisions of article V, section 9, of the Florida Constitution, the Florida Supreme Court is responsible for determining the need for an increase or decrease in the number of judges required to consider and dispose of cases filed before the respective courts. To this end, we have analyzed case filings and evaluated the growth in the workload of the state courts system over the past several years, in light of additional judgeships which have been authorized each year by the Florida Legislature.
As the result of this review, we are certifying the need for two district court of appeal judges, eight circuit court judges, and thirteen county court judges. A comparison of the requests for new judges filed by the respective courts and the new judgeships certified as needed for fiscal year 1992-93 follows.
*242 [[Image here]]
*243 Florida Rule of Judicial Administration 2.035(b)(2) sets forth the criteria for certification of need for additional judges in the district courts of appeal. The Court received a request for two additional judge-ships from the First District Court of Appeal. We certify the need for both judge-ships. In making this recommendation we gave the greatest weight to past and projected filings for the First District Court of Appeal.
The last judgeship authorized for the First District Court of Appeal was effective in January 1990. Two judgeships were certified as necessary in 1991, but they were neither authorized nor funded by the Florida Legislature. Total filings for the First District Court of Appeal have increased almost 27% since 1989, while the other four district courts of appeal combined have experienced only a 7% growth rate in filings during the same time period. It is projected that from 1989 to the end of 1992 total filings will have increased by 927 cases. This growth trend is consistent in all categories of cases, including criminal, civil, administrative, and workers’ compensation matters. Additionally, the First District Court of Appeal handles a disproportionate share of appeals of administrative rulings. This class of cases is usually more demanding in terms of judicial time and effort than general civil and criminal appeals. These factors are sufficient to justify two additional judgeships for the First District Court of Appeal.
The addition of two judges will bring the total number of judges in the First District Court of Appeal to fifteen. An analysis of the filing rates suggests that the trend of increased filings will continue into the foreseeable future. Anticipated increases in case filings and the fact that this court will have the highest number of judges of any of the district courts of appeal warrant a review of alternatives for meeting the increased workload requirements in future years through organizational, structural, and procedural means. The Supreme Court will initiate such a review over the next year.
Florida Rule of Judicial Administration 2.035(b)(1) sets forth the criteria for certification of need for judges at the trial court level. As with certifications of recent years, we have placed the greatest weight on statistical data reflecting the growth and composition of caseloads in the various circuits and counties. We have determined that the most consistent and reliable factor at the circuit court level is total case filings per judge. Criminal, civil, probate, domestic relations, guardianship, and juvenile case filings for each circuit are also evaluated by applying different weights reflecting their different requirements for judicial hearing time and attention. The filings-per-judge statistics for the county courts are adjusted to exclude worthless check offenses and criminal and civil traffic infractions, except for “driving under the influence” (DUI) infractions. In addition to those factors prescribed in Florida Rule of Judicial Administration 2.035, other criteria we considered included the use of county and senior judges on temporary assignment; the availability of supplemental hearing resources furnished by the counties (traffic magistrates, child support hearing officers, commissioners, and general or special masters); reliance on mediation and arbitration to resolve cases; and special local circumstances that affect case handling.
The need for additional judgeships at the circuit court level is more limited than in recent years. Even though the eight circuit judges certified as necessary by this Court in fiscal 1991-92 were not funded, we find it necessary to certify the need for only eight circuit judges this year. We hereby certify the need for one additional circuit judgeship for the Third, Tenth, Twelfth, and Nineteenth Judicial Circuits. We certify the need for two additional circuit judgeships for the Ninth and Twentieth Judicial Circuits.
Our data shows that the rate of increase in filings in the circuit courts, which had been quite dramatic during the later half of the 1980s, has slowed significantly since the last half of 1989. This is largely due to lower filing rates in the criminal divisions in many circuits. Criminal filings are down *244 7.5% since 1989. This is mainly attributable to a substantial drop in property and drug crimes over the past two years of 14% and 20% respectively. Violent criminal filings (murder, rape, assault, and robbery) are up 3% for the same period. Seventeen of the twenty judicial circuits experienced decreases in criminal filings since 1989; only the Ninth, Tenth, and Twentieth Judicial Circuits realized growth in workload in this category.
Civil, domestic relations, and juvenile filings are up slightly statewide but there is considerable variance in workload growth among the twenty judicial circuits. Civil filings are up 1.5% since 1989, largely due to a significant increase in real property and mortgage foreclosure cases. Personal injury litigation has also increased slightly during this time period. However, caseload statistics show a substantial decline in the number of contract and bad debt cases. This decrease is primarily due to the change in the monetary jurisdiction of the circuit court from $5,000 to $10,000, which was effective on October 1, 1990. All circuits experienced sharp declines in these types of civil filings after that date. There was a concurrent increase in county civil filings.
Domestic relations filings are up 10% since 1989. Much of the increase can be attributed to the increases in domestic violence petitions. Since 1986, when the statute governing domestic violence was substantially amended, domestic violence petitions have risen from approximately 800 a month to more than 3,000 in September 1991. All circuits have experienced this pattern of growth.
Juvenile filings are up 6% since 1989, but there are significantly different trends in delinquency versus dependency filings. Delinquency filings are up 11% over the past two years, with seventeen of the twenty circuits experiencing increases. Dependency filings are down 25%, with only the Sixth and Eleventh Judicial Circuits experiencing increases.
Probate filings have remained relatively constant. However, eleven of the twenty circuits did experience a slight decline in the number of filings since 1989.
Still, we find compelling justification for eight new circuit court judgeships. All of the courts for which new circuit judgeships are requested are projected to have 1992 filings levels well above the 1,865 filings-per-judge threshold, at which this Court has determined there is a presumptive need for more judicial resources. Other factors, such as geographical constraints affecting judicial assignments, reliance on senior judges on temporary assignment, and historical assignments of county judges to hear circuit court matters, weighed heavily in our decisions for selected circuits.
These judgeships are critical to the ability of the circuit courts to keep up with caseloads. Each year the courts are surveyed to determine how long litigants and attorneys must wait before their cases may be heard before a judge. The survey captures data on the time a litigant has to wait to get a jury trial in a criminal or civil case once the case is trial-ready and how long it takes to get a hearing on a routine motion, based on the expected length of the hearing. The data gathered this year indicated that, except for capital murder cases, a majority of the judges who responded are scheduling jury trials in criminal cases within sixty days of the request. In capital murder cases, the wait for a jury trial is almost twice that long in the majority of cases. Overall, more than 90% of the capital murder trials and 99% of other criminal trials are scheduled within 180 days of the request..
In contrast, less than 20% of the civil jury trials can be scheduled within sixty days of the request. A request for a jury trial of less than five days in a civil case requires an average wait of between 90 and 120 days, once discovery is complete and the case is at issue. The majority of trials estimated to last five days or longer cannot be scheduled any sooner than 120 to 180 days. Almost 20% of the trials lasting more than five days must be scheduled more than 180 days from the date of the request.
*245 Hearings on motions related to criminal cases are heard much more quickly than those in civil cases. Hearings of less than thirty minutes are generally scheduled within fifteen days of the request in the majority of criminal cases. In criminal cases, only 5% of the motion hearings must be set more than sixty days beyond the date of the request. Only approximately 33% of the civil motion hearings are scheduled within fifteen days, and almost 40% of motion hearings requiring more than thirty minutes are scheduled at least sixty days from the date of the request. Parties in domestic relations cases who request a hearing for routine motions that will require longer than thirty minutes must wait more than sixty days.
The significant differences in waiting time to have motions heard or cases tried in civil versus criminal matters are developing because, in times when resources are limited, chief judges must ensure criminal dockets are adequately covered. The effect is that civil calendars become more congested. With the disposition rates leveling off in recent years, which suggests Florida judges are working at or near capacity, these already intolerable delays will only get worse if the additional judgeships we have certified are not authorized and funded. The eight circuit court judgeships we find to be needed will not enable a reversal of these trends, but they are crucial to our ability to avoid greater delays than are currently the norm in many circuits.
County court criminal and civil filings declined slightly since 1989, while DUI filings continue to increase at a rapid rate. This increase has had considerable impact on county judge workloads because DUI cases are far more complicated and likely to require a jury trial. In 1990, DUI jury trials accounted for almost 50% of all jury-trials held in county court. Also, all counties have experienced a substantial increase in the number of civil filings in matters involving more than $2,500. Again, this is due to the change in county court civil jurisdiction from $5,000 to $10,000, effective October 1, 1990. It is noted that the monetary jurisdiction of the courts will increase again, to $15,000, on July 1, 1992, resulting in the shift of more cases to these courts. Further, in many counties, chief judges have assigned county judges to hear simplified dissolutions and other uncontested dissolutions pursuant to legislative authorization which was also effective October 1, 1990. While the growth of caseloads in the county courts recently leveled off, the rapid rise in county court caseloads during the latter half of the 1980s has left many urban counties with insufficient judicial resources. This Court was conservative in its certification of additional county judges prior to 1991. Between 1987 and 1990, only twenty county judgeships were certified. We certified the need for twelve county judges last year, but the legislature neither authorized nor funded the request. We are certifying the need for thirteen new county court judgeships for fiscal year 1992-93. One additional judgeship is deemed necessary for Clay, Pinellas, Orange, Polk, Dade, Palm Beach, and Brevard Counties. Two additional judgeships are required in Duval, Hillsborough, and Bro-ward Counties.
In evaluating the need for such positions, we relied principally on filings data that were adjusted to include only criminal, civil, and DUI cases. Worthless check cases, non-DUI criminal traffic infractions, and civil traffic infractions were weighted less heavily because of their limited requirements for judicial time, the diversion of large numbers of worthless check cases in selected circuits, and the variability and volume of such cases reported from county to county. We used a range of 3,700 to 3,800 adjusted filings per judge as the threshold at which there is a presumptive need for additional judicial positions. County courts with caseloads near or exceeding that level were judged to be operating at or above capacity. County judges in such courts were found to have relatively little time to assist with case assignments at the circuit court level. Where the judges in these counties did help with the circuit court workload, it was to the detriment of case processing in the county courts. All of the counties for which certification of need is made are projected to *246 have between 3,718 and 4,566 adjusted filings per judge in 1992.
Florida trial courts have continued to address workload pressures by relying heavily on the temporary assignment of senior judges. A total of 4,582 days of service was provided by senior judges in fiscal year 1990-91. This is the equivalent of approximately 19.2 judge years. Were it not for the availability of this resource, the delays in scheduling hearings and trials outlined previously would be much greater. We expect demand for senior judge service to continue to grow since no new judge-ships were authorized for the current fiscal year. Yet, budget cutbacks have forced a curtailment in the assignment of senior judges. A total of $415,000 was cut from the appropriation, which is the equivalent of 6.5 years of judicial service. The use of senior judges is the most cost-effective and flexible program we have to address scheduling problems and emergencies as they arise. The Court is seeking restoration of the funds that were cut and full funding of its fiscal year 1992-93 budget request for approximately 5,050 days of senior judge service. This is viewed as a critical companion measure of the judicial certification.
Full funding for the requests certified as needed herein is deemed absolutely essential if Florida’s courts are to fulfill their constitutional mandate to try cases in a fair, impartial, and timely manner.
It is so ordered.
overton, McDonald, barkett, GRIMES, KOGAN and HARDING, JJ., concur.